## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 21 2020, 10:00 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Joel C. Wieneke
Wieneke Law Office, LLC
Brooklyn, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Jodi Kathryn Stein
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

J.B.E.,

*Appellant-Respondent,*

v.

State of Indiana,

*Appellee-Petitioner,*

December 21, 2020

Court of Appeals Case No.
20A-JV-1262

Appeal from the Greene Circuit Court

The Honorable Erik C. Allen, Judge

Trial Court Cause Nos.
28C01-2001-JS-1
28C01-2006-JD-23

**Robb, Judge.**

# Case Summary and Issues

[1] J.B.E. appeals the juvenile court's order awarding wardship of her to the Indiana Department of Correction ("DOC") for housing in a correctional facility for children. J.B.E. raises several issues for our review which we restate as: (1) whether the juvenile court abused its discretion by placing her in the DOC; and (2) whether J.B.E.'s placement in the DOC violates certain provisions of the state and federal constitutions. Concluding the juvenile court did not abuse its discretion and J.B.E.'s placement was not unconstitutional, we affirm.

# Facts and Procedural History

[2] On December 19, 2019, J.B.H. contacted the Greene County Sheriff's Department and reported that her fourteen-year-old daughter, J.B.E., was missing. Around the same time, fifteen-year-old S.M, J.B.E.'s girlfriend, was also reported missing.

[3] The next day, J.B.E. and S.M. were located at a friend's house. A sheriff took them to the department, where they spoke to the juvenile probation officer and were then released to their parents. On January 10, 2020, in Cause No. 28C01-2001-JS-1 ("Cause No. JS-1"), the State filed a petition alleging J.B.E. was a delinquent child for committing the status offense of leaving home without reasonable cause and permission of a parent.

[4] A fact-finding hearing was held on March 10 during which J.B.E. admitted to the allegations in the petition. On March 20, the juvenile court entered a dispositional decree adjudicating J.B.E. a delinquent child for the offense of running away, ordering J.B.E. to be on supervised probation for nine months, and finding that J.B.E. "has become a chronic runaway in the month of December, 2019 generating 3 calls to the Sheriff's Department to locate her. Her mother is very concerned about impulsiveness and inability to follow reasonable requests." Appellant's Appendix, Volume II at 43-44. Because of the discord between J.B.E. and her mother, J.B.E. was placed in the care and custody of Kimberly McGuire, a family friend, and ordered to participate in individual and family therapy, maintain good behavior, refrain from running away or violating the law, and obey all rules and regulations imposed on her. *See id.* at 47.

[5] On March 27, J.B.E. hid her sister and S.M., two runaway juveniles, in McGuire's home without McGuire's knowledge. On March 28 and April 1, law enforcement officers checked McGuire's home but did not find the missing juveniles. Later on April 1, officers discovered evidence that the juveniles had been in the home and J.B.E. admitted that they had been there the entire time without McGuire's knowledge. In response to these events, on April 7, J.B.E.'s probation officer, Julie Johnson, filed a Verified Petition for Modification of Dispositional Decree asking the juvenile court to review J.B.E.'s placement due to McGuire's "concerns about her ability to monitor [J.B.E.]'s behavior" and

J.B.E. may need to be in "a more secure placement with 24-hour supervision." *Id.* at 49.

[6] A hearing on the motion was held on May 12. Johnson recommended that J.B.E. be placed in emergency shelter care at Open Arms Christian Ministries Group Home for Girls where she could receive services and her mother would have regular contact with the facility. The juvenile court took the matter under advisement and on May 18, issued its Order for Emergency Shelter Care removing J.B.E. from McGuire's home and placing J.B.E. at Open Arms Group Home for no more than twenty days. The same day, a detective with the Greene County Sheriff's Department went to McGuire's home to transport J.B.E. to Open Arms. Upon arrival, the detective allowed J.B.E. to gather her personal items from her bedroom. When J.B.E. did not timely return, the detective went to her bedroom to investigate and discovered it was locked. After gaining entry, the detective went into the room and found the window open. J.B.E. had fled from the house by jumping out of her second story bedroom window. After she fled, J.B.E. reached out to her sister and mother via social media and reported, "I love you and I am safe." *Id.* at 56. Officers began searching for J.B.E.

[7] Based on J.B.E.'s flight, on May 19, Johnson filed an amended petition to modify the dispositional decree. Four days after she fled, J.B.E. was located in Bloomington, where Johnson suspected J.B.E. had been around unsafe individuals. After J.B.E. was located, a GPS monitoring bracelet was placed on her ankle. Shortly thereafter, J.B.E. attempted suicide and was taken to

Meadows Hospital for her own safety and for a diagnostic evaluation. On May 26, while still in the hospital, J.B.E. removed her GPS monitoring bracelet by "chewing it off[,]" which caused damage to the device. *Id.* at 68.

[8] On May 28, the juvenile court held a hearing on the amended petition. During the hearing, J.B.E. admitted to the allegations in the petition and consented to placement at Valle Vista Health Systems,[1] Children and Adolescent Unit to be evaluated. The juvenile court provided J.B.E. with a written warning of the consequences for violating her placement. The juvenile court read the warning and provided her with a physical copy. The juvenile court also summarized the warning:

> In short, what that means now, once you're being placed at
> Valley [sic] Vista, if you do not follow the rules and you runaway
> [sic] again, now as a status offender, I can put you in a locked
> facility, up to and including the [DOC] or Girls' School Facility.
> And I want you to understand that. And you have pushed us to
> a point where we would have zero other options.

Transcript of Evidence, Volume 2 at 71.

[9] The next day, J.B.E. was placed at Valle Vista. Several days later, on June 3, an administrator at Valle Vista contacted Johnson and requested that J.B.E. be immediately removed from the facility. The administrator reported that

---

[1] Throughout the record, this facility is also referred to as "Valley Vista." Although it is unclear from the record which is correct, we refer to this facility as "Valle Vista" throughout this opinion, as this is the name that appears in the June 3, 2020 Verified Petition for Modification of Dispositional Decree.

J.B.E.'s behavior "posed a significant safety risk to herself and other residents. She has repeatedly broken through the unit doors, eloping from the unit and allowing other youth to be exposed to unsecured areas[.]" Appellant's App., Vol. II at 68. It was also reported that J.B.E. "jumped a fence after eloping from the unit and began climbing towards the roof, requiring physical intervention from our staff to ensure her safety" and she had repeatedly engaged in property destruction, including dismantling doors. *Id.* Due to J.B.E.'s high risk behavior, the facility requested her immediate removal and recommended that she be placed in a locked and secure setting.

[10] The same day, Johnson filed a third verified petition for modification of the dispositional order, stating she believed J.B.E. needed to be placed in the Indiana Girls School. Also that day, the State filed a petition alleging J.B.E. to be a delinquent child for acts that would constitute criminal mischief, a Class B misdemeanor, if committed by an adult. A separate cause number was assigned for the charge: Cause No. 28C01-2006-JD-23 ("Cause No. JD-23"). The State alleged J.B.E. recklessly, knowingly, or intentionally damaged or defaced Greene County Community Corrections' property by biting and damaging the ankle strap of her GPS monitoring device. *See id.* at 96.

[11] On June 8, the juvenile court held an initial hearing on the State's new petition in Cause No. JD-23 and the petition to modify the dispositional decree in Cause No. JS-1. At the hearing, J.B.E. admitted to the new allegations. Johnson recommended that J.B.E. be committed to the DOC for placement in the Indiana Girls' School. She testified that

[J.B.E. has] earned this road and she needs to pave it. . . .We've chased her all over Bloomington, sixteen hours of overtime last time looking for her because she jumped out of a window, when the officer was clearly being nice to her and allowed her to gather her belongings.  Running with people who are extremely dangerous, doesn't care how it affects her family, her mom, her siblings – only when we're here today, now she wants to follow the rules, and . . . her behavior has not indicated that.  So, I feel like she'll be safe at Girls' School.  We'll know where she's at.  She can't get away [and s]he'll have to complete the program.  I hope she takes that to heart and does that, but I think at this point, that's the only available opportunity for [her].

Tr., Vol. 2 at 88.  J.B.E. also testified.  When asked why she removed the GPS device, she responded, "I don't know what I was thinking."  *Id.* at 82.  J.B.E. proposed being placed in a residential group home.

[12]  Ultimately, the juvenile court decided it was in J.B.E.'s best interest to be placed in the DOC, reasoning that:

> [T]here is only one decision, one option.  [Y]ou had an opportunity initially to . . . stay home, but that wasn't what you wanted to do.  You had the kinship placement, that turned out not to be a good situation.  But, didn't recognize that.  When ordered, you removed from that and placed at Open Arms, you jumped out the window, again, and took off, put yourself and others at risk.  Over a period of days, . . . trying to track you down, and finally, I think, you turned yourself in at that point, made arrangements to . . . be picked up.  And, then Valley [sic] Vista was a place that I believe would really meet your needs, and it was . . . a locked facility, which was important, but less restrictive than detention or [DOC] and that couldn't even get off the ground before that placement blew up.  [T]he problem is each step of the way you have not complied with the . . . rules or the

orders of the court in some circumstances and continue to put yourself and others at risk. And, a less restrictive placement than a locked facility . . . put you at risk and would not be meeting your needs, because it gives you the freedom right now to avoid doing what you have to do. And, right now you can't handle that freedom. So, I mean, . . . there is no other option. I wish there was a . . . different option of a . . . residential placement, but there's not right now. [T]his has been a stair step process, quickly elevating to the point that the [DOC], Girls' School Facility is the only option we have to ensure your wellbeing, to ensure proper services are provided. And, I want you to understand that the placement that I'm going to order there is going to be dependent upon you, and the duration of it – how you do, how you handle yourself, how you respond to things. . . . The way you get out is you earn your way out by complying and doing what you need to do and, . . . working the services and the programs there[.] Because if you do not do that, the longer you will stay. . . . [T]his isn't necessarily punishment – now certainly by virtue of what it is and a locked facility and all that, there's an element that is punishment just because it is what it is, but the purpose is to help you. Okay? Help you and your family. . . . I'm asking you to . . . give it your best shot . . . [f]or you. You deserve that. And, you need this to protect yourself and to improve yourself.

*Id.* at 95-97. The juvenile court subsequently issued its written dispositional order placing J.B.E. in the DOC for an indeterminate period. J.B.E. now appeals. Additional facts will be provided as necessary.

# Discussion and Decision

# I. Dispositional Decree

## A. Standard of Review

[13] The disposition of a juvenile adjudicated a delinquent is a matter committed to the sound discretion of the juvenile court. *A.C. v. State*, 144 N.E.3d 810, 812 (Ind. Ct. App. 2020). The juvenile court is afforded wide latitude and great flexibility in its dealings with juveniles; however, its goal is to rehabilitate rather than punish. *D.S. v. State,* 829 N.E.2d 1081, 1085 (Ind. Ct. App. 2005). The juvenile court's discretion is subject to the statutory considerations of the welfare of the child, the safety of the community, and the legislative policy favoring the least harsh disposition. *R.H. v. State*, 937 N.E.2d 386, 388 (Ind. Ct. App. 2010); *see also* Ind. Code § 31-37-18-6. An abuse of discretion occurs when the juvenile court's decision is clearly erroneous and against the logic and effect of the facts and circumstances before it or the reasonable, probable, and actual inferences that can be drawn therefrom. *M.C. v. State*, 134 N.E.3d 453, 458 (Ind. Ct. App. 2019), *trans. denied, cert. denied*, --- U.S. ---, 2020 WL 6121643 (Oct. 19, 2020).

## B. Commitment to the DOC

[14] J.B.E. argues the juvenile court abused its discretion by committing her to the DOC because her "misconduct did not justify such a harsh sanction, which was inconsistent with the juvenile code and [her] history, circumstances, best interests, and risk posed to the community." Brief of the Appellant at 16. We disagree.

Indiana Code section 31-37-18-6 sets forth several factors a juvenile court must consider in entering a dispositional decree:

> If consistent with the safety of the community and the best interest of the child, the juvenile court shall enter a dispositional decree that:
>
> (1) is:
>
>> (A) in the least restrictive (most family like) and most appropriate setting available; and
>>
>> (B) close to the parents' home, consistent with the best interest and special needs of the child;
>
> (2) least interferes with family autonomy;
>
> (3) is least disruptive of family life;
>
> (4) imposes the least restraint on the freedom of the child and the child's parent, guardian, or custodian; and
>
> (5) provides a reasonable opportunity for participation by the child's parent, guardian, or custodian.

There is no question that the statute requires the juvenile court to select the least restrictive placement in most situations, but in certain circumstances, a more restrictive placement might be appropriate. *K.A. v. State*, 775 N.E.2d 382, 386-87 (Ind. Ct. App. 2002), *trans. denied*. Specifically, it is appropriate when the best interest of the child and the safety of the community is better served by a

more restrictive placement. *C.C. v. State*, 831 N.E.2d 215, 219 (Ind. Ct. App. 2005); Ind. Code § 31-37-18-6.

[17] J.B.E. first argues that she was committed to DOC for her status offenses of running away, which is not authorized by statute. She claims, "[T]he act alleged to constitute Criminal Mischief was just an incidental part of [her] efforts to run away – not an independent offense in itself." Br. of the Appellant at 19. J.B.E. is correct that a juvenile adjudicated for a status offense, such as running away, cannot be committed to the DOC. *See* Ind. Code § 31-37-19-1. However, as J.B.E. acknowledges, the juvenile court has the authority to commit a juvenile to the DOC for the commission of delinquent acts. Ind. Code § 31-37-19-6(b)(2)(A)(i).

[18] Contrary to J.B.E.'s assertion, she was not committed to the DOC for her status offenses. We agree with the State that "[i]t was only after all of [J.B.E.'s] placements failed under [Cause No.] JS-1 *and* [J.B.E.] committed the new delinquent act of criminal mischief under [Cause No.] JD-23 that the juvenile court awarded commitment to the DOC." State's Brief of Appellee at 20 (footnote omitted).

[19] J.B.E.'s recent contact with our juvenile justice system began with her running away with her girlfriend in December 2019. She was adjudicated a delinquent child for her status offense, which resulted in her kinship placement with McGuire in March 2020. During this time, J.B.E. was required to participate in therapy, maintain good behavior, obey rules, and refrain from running away or

violating the law. Two weeks into this placement, J.B.E. hid two runaway juveniles in McGuire's house without McGuire's knowledge. As a result, the juvenile court issued an Order for Emergency Shelter Care removing J.B.E. from McGuire's home and placing her in Open Arms group home, a more secure facility with supervision and services. When a detective arrived at McGuire's house to transport J.B.E. to the facility, he allowed her to gather some personal belongings. Instead of complying, J.B.E. jumped from her second story bedroom window and fled. Four days later, J.B.E. was found. A GPS monitoring device was placed on J.B.E.'s ankle and shortly thereafter, she attempted suicide and was taken to the hospital. At the hospital, J.B.E. chewed off the monitoring device, which caused damage to it. The juvenile court modified its dispositional order to place J.B.E. at Valle Vista, a residential treatment facility. J.B.E. was there from May 29 to June 3, at which time the facility requested J.B.E.'s immediate removal because she posed a risk to herself and others. The State then filed a petition alleging J.B.E. committed the delinquent act of criminal mischief, a Class B misdemeanor if committed by an adult. At the hearing addressing the new petition, as well as another petition to modify the dispositional decree, J.B.E. admitted to the allegations and was adjudicated a delinquent child.

[20] It was only after all of these failed less restrictive placements and the newly committed delinquent act that the juvenile court believed it had no other option but to place J.B.E. in the DOC for her own safety and the safety of the community. The juvenile court explained that J.B.E. has continued to put

herself and others at risk and anything other than a locked facility would be a disservice "because it [would] put you at risk and would not be meeting your needs, because it gives you the freedom right now to avoid doing what you have to do. And, right now you can't handle that freedom." Tr., Vol. 2 at 96. The juvenile court even stated that "there is no other option. I wish there was a . . . different option of a . . . residential placement, but there's not right now. [T]his has been a stair step process, quickly elevating to the point that the [DOC], Girls' School Facility is the only option we have to ensure your wellbeing, to ensure proper services are provided." *Id.*

[21] J.B.E. claims "[p]lacement at a treatment facility would be least disruptive of family life, impose the least restraint on [her] freedom . . ., and provide a reasonable opportunity for participation by [her] family." Br. of the Appellant at 23. But J.B.E. now fails to acknowledge that she *was* placed in a treatment facility for several days before the facility administrator requested J.B.E.'s immediate removal due to her behavior, which posed a risk to herself and others. J.B.E. also claims there were other less restrictive options that her probation officer did not pursue. At the initial hearing on the new petition for delinquency and modification of the dispositional order, Johnson testified that she checked with one facility, Lutherwood, but it had a wait list. *See* Tr., Vol. 2 at 87. She also testified there was one outstanding facility she had not contacted, but it was a five- or six-hour drive and did not want to ask the sheriff to drive J.B.E. that far for her to only last a few days. She did not know whether the facility had a wait list or whether they would accept J.B.E. *See id.*

at 88. However, Indiana Code section 31-37-18-6 only requires the juvenile court to select the least restrictive placement if it is in the best interest of the juvenile and the community. And there is no requirement that a juvenile court needs to have exhausted *all* available less restrictive placements before committing a juvenile to the DOC.

[22] As our supreme court has explained,

> The nature of the juvenile process is rehabilitation and aid to the juvenile to direct his behavior so that he will not later become a criminal. . . . When a juvenile is found to be delinquent, a program is attempted to deter him from going further in that direction in the hope that he can straighten out his life before the stigma of criminal conviction and the resultant detriment to society is realized. In contrast, when an adult is convicted of a crime, the conviction is a stigma that follows him through life, creating many roadblocks to rehabilitation. In addition to the general stigma of being an "ex-con", or a felon, the conviction subjects him to being found a habitual criminal if he later commits additional felonies, and affects his credibility as a witness in future trials. The Legislature purposely designed the procedures of juvenile determinations so that these problems are not visited on those found to be juvenile delinquents in a juvenile court.

*Jordan v. State*, 512 N.E.2d 407, 408-09 (Ind. 1987) (emphasis added).

[23] J.B.E. was not committed to the DOC as punishment. She was sent there for the sole purpose of reforming her behavior and protecting her and the community. We acknowledge that the offenses committed by J.B.E., in isolation, are relatively minor; however, when considering her history as a

whole and the fact that other less restrictive placements have not succeeded in reforming J.B.E., the juvenile court had no other option but to place her in the DOC. Ultimately, the record supports the juvenile court's conclusion that a more restrictive placement for J.B.E., a secure facility where she can engage in rehabilitative services, was in the best interest of herself and the community. Therefore, we cannot conclude the juvenile court abused its discretion by committing J.B.E. to the DOC.

## III. Constitutional Issues

J.B.E. also raises several state and federal constitutional claims she acknowledges were not raised to the juvenile court. Therefore, the State argues J.B.E. has waived appellate review of these issues. *See* State's Br. of Appellee at 23, 31. However,

> our Supreme Court has determined that "[e]ven though the general rule is that failure to challenge the constitutionality of a statute at trial results in waiver of review on appeal, this Court as well as the Court of Appeals has long exercised its discretion to address the merits of a party's constitutional claim notwithstanding waiver."

*M.C.,* 134 N.E.3d at 459 (quoting *Plank v. Cmty. Hosps. of Ind., Inc.,* 981 N.E.2d 49, 53 (Ind. 2013)). We exercise our discretion to review J.B.E.'s claims.

## A. Federal Equal Protection and Article 1, section 23 of the Indiana Constitution

J.B.E. contends that the statutory framework authorizing her commitment to the DOC is unconstitutional under the federal Equal Protection clause and Article 1, section 23 of the Indiana Constitution because "[t]he juvenile court imposed greater restrictions on [her] liberty than an adult would have suffered for the same misconduct." Br. of the Appellant at 25. We disagree.

The Fourteenth Amendment to the United States Constitution prohibits states from "deny[ing] to any person within its jurisdiction the equal protection of the laws." J.B.E. claims that a strict scrutiny analysis applies to the Equal Protection Clause of the Fourteenth Amendment. However, the United States Supreme Court has rejected age as a suspect class, stating that "[o]ld age . . . does not define a discrete and insular minority because all persons, if they live out their normal life spans, will experience it." *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 83 (2000). As such, it has held that "States may discriminate on the basis of age without offending the Fourteenth Amendment if the age classification in question is *rationally related* to a legitimate state interest." *Id.* (emphasis added). Therefore, because our juvenile justice statutes do not involve a suspect classification, rational basis review applies and J.B.E. "must demonstrate that there is no rational basis to treat juvenile delinquents differently than adult offenders." *M.C.,* 134 N.E.3d at 460.

This court recently addressed this very question in *M.C.*, in which M.C., a juvenile, had been committed to the DOC after his continued marijuana use,

commission of additional offenses, theft, and failed less restrictive placements. *Id.* at 457-59. M.C. challenged the juvenile court's disposition placing him in the DOC arguing that the imposition of greater restrictions on a juvenile than an adult violated equal protection principles under the Fourteenth Amendment and Article 1, section 23 of our state constitution. *Id.* at 460. We rejected M.C.'s argument and reemphasized that the juvenile system's goal is reformation and rehabilitation of juveniles, a juvenile court's dispositional options do not amount to "'sentences' for 'crimes[,]'" and instead of punishment, commitment to the DOC ensures that a juvenile receives the rehabilitative counseling needed in a secure environment. *Id.* at 461. As a result, we concluded that "disparate treatment between adults and juvenile offenders is required to address the nuances of youth" and are "rationally related to the goal of ensuring rehabilitation of juveniles." *Id.* And thus, the disparate treatment of juveniles does not violate the Equal Protection Clause of the Fourteenth Amendment. *Id.* We find *M.C.'s* well-reasoned analysis applicable here.[2]

[28] In an attempt to distinguish *M.C.*, J.B.E. claims that her conduct was much less severe. However, given the underlying rationale for treating juveniles differently, we are unpersuaded that the degree of her conduct impacts our analysis. Here, the juvenile court resorted to the DOC for the sole purpose of

---

[2] J.B.E. respectfully claims *M.C.* was wrongly decided. We disagree.

reforming J.B.E.'s behavior before she reached adulthood because her placements in less-restrictive environments failed and the juvenile court had no other option to ensure her safety and the safety of the community. *See id.*

[29] Similarly, J.B.E. also argues her commitment to the DOC violates the privileges and immunities clause of Article 1, section 23 of the Indiana Constitution, which provides: "The General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities, which, upon the same terms, shall not equally belong to all citizens." The section imposes two requirements on statutes that grant unequal privileges and immunities: (1) "the disparate treatment accorded by the legislation must be reasonably related to inherent characteristics [that] distinguish the unequally treated classes"; and (2) "the preferential treatment must be uniformly applicable and equally available to all persons similarly situated." *Ledbetter v. Hunter*, 842 N.E.2d 810, 812 (Ind. 2006) (quoting *Collins v. Day*, 644 N.E.2d 72, 80 (Ind. 1994)). Each prong has two requirements. *Id.* at 813. The first prong requires that (a) the classification be based on "distinctive, inherent characteristics that rationally distinguish the unequally treated class[;]" and (b) the disparate treatment be reasonably related to the distinguishing characteristics. *Id.* (quotation omitted). And the second prong requires that (a) any privileged classification be open to any and all persons who share the inherent characteristics that distinguish and justify such classification; and (b) the special treatment be extended equally to all persons in such classification. *Id.* In applying this standard, "courts must accord considerable deference to the manner in which the legislature has balanced the

competing interests involved [and] so long as the classification is based upon substantial distinctions with reference to the subject matter, we will not substitute our judgment for that of the legislature[.]" *Id.*

[30] Applying this standard, the *M.C.* court held, and we agree that "distinguishing between juvenile delinquents and adult offenders is rationally related to the goal of promoting rehabilitation among juvenile delinquents. Restrictive placements, including the DOC, can promote rehabilitation and the policy of individual accountability." 134 N.E.3d at 462. Here, J.B.E.'s commitment to the DOC will allow her to obtain the rehabilitative services she needs to change her behavior and, as the juvenile court noted, the duration of J.B.E.'s commitment is within her control. Once she has been rehabilitated, she will be released. We cannot conclude her commitment to the DOC violates the privileges and immunities clause of our constitution.

[31] In sum, the juvenile statutes authorizing J.B.E.'s placement in the DOC do not violate the principles of the Fourteenth Amendment or Article 1, section 23 of the Indiana Constitution.

## B. Eighth Amendment and Article 1, section 16

[32] J.B.E. also challenges the constitutionality of her commitment to the DOC under the cruel and unusual punishment clause of the Eighth Amendment and the proportionality clause of the Indiana Constitution, Article 1, section 16.

[33] The Eighth Amendment to the United States Constitution provides, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual

punishments inflicted." Proportionality is central and "[e]mbodied in the . . . ban on cruel and unusual punishments is the precept of justice that punishment for crime should be graduated and proportioned to [the] offense." *Graham v. Florida*, 560 U.S. 48, 59 (2010) (internal quotation omitted). The clause applies to the criminal process, namely direct actions by the government to inflict punishment. *M.C.,* 134 N.E.3d at 463. Similarly, Article 1, section 16 of our constitution provides, in part, "Cruel and unusual punishments shall not be inflicted. All penalties shall be proportioned to the nature of the offense."

[34] However, our supreme court has made it clear that "a juvenile case is a civil and not a criminal matter. Juvenile adjudications do not constitute criminal convictions." *Jordan*, 512 N.E.2d at 408. Accordingly, "[n]one of the[ ] commitments [available to the juvenile court] are considered sentences." *Id.* In *M.C.*, we acknowledged that our supreme court has not yet specifically addressed whether the Eighth Amendment is applicable to delinquency proceedings. *M.C.,* 134 N.E.3d at 463. Instead, the panel relied on *In re Rodney H.,* 861 N.E.2d 623, 629-30 (Ill. 2006), an Illinois Supreme Court case that held that juvenile delinquency proceedings do not implicate the Eighth Amendment because the purpose of a delinquency petition is to rehabilitate, not punish. *Id.* Applying that reasoning, we concluded the same, stating that

> our General Assembly has codified the goal of the juvenile system by requiring juvenile courts to consider the needs of the child, efforts made to prevent removal from the parents, and various services that must be offered to juvenile offenders. I.C. § 31-37-18-9. Furthermore, our legislature has imposed strict

> requirements on juvenile facilities to provide recreation, education, counseling, and health care that must be operated by qualified staff to provide such programs and treatment. *See* I.C. § 31-37-19-21. Delinquency actions are designed to rehabilitate and correct, and they encourage juveniles to "straighten out [their lives] before the stigma of criminal conviction and the resultant detriment to society is realized." *Jordan*[, 512 N.E.2d at 409]. Indeed, Article 9, [s]ection 2 of the Indiana Constitution states "The General Assembly shall provide institutions for the correction and reformation of juvenile offenders."

*Id.* at 463-64 (footnote omitted). Therefore, we held that the juvenile court's dispositional order was not a penalty or punishment implicating the Eighth Amendment and the appellant's argument that commitment to the DOC violated Article 1, section 16 of our state constitution unavailing. *Id.* at 464.

[35] We conclude the same here. J.B.E.'s commitment to the DOC is not a punishment within the meaning of the Eighth Amendment or Article 1, section 16 of the Indiana Constitution.

# Conclusion

[36] For the reasons set forth above, we conclude the juvenile court did not abuse its discretion by placing J.B.E. in the DOC. We also conclude that our juvenile statutes do not violate the equal protection or privileges and immunities principles under the Fourteenth Amendment or Article 1, section 23 of the Indiana Constitution, or the cruel and unusual punishment clause of the Eighth Amendment or Article 1, section 16 of the Indiana Constitution. Therefore, we affirm.

Affirmed.

Crone, J., and Brown, J., concur.